**BRITISH TELECOMMUNICATIONS PLC, Plaintiff,**

v.

**PRODIGY COMMUNICATIONS CORPORATION, Defendant.**

**No. 00 Civ. 9451(CM).**

United States District Court, S.D. New York.

Aug. 22, 2002.

Albert J. Breneisen, Benjamin Hershkowitz, Robert F. Perry, Edward J. Han-dler, Kenyon & Kenyon, New York City, for Plaintiff.

James I. Serota, Vinson & Elkins, LLP, New York City, Willem G. Schuurman, Andrew G. DiNovo, David B. Weaver, Avelyn Ross, David E. Killough, Vinson & Elkins, LLP, Austin, TX, for Defendant.

## DECISION AND ORDER

MCMAHON, District Judge.

### MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT

Plaintiff British Telecommunications ("BT") asserts that Defendant Prodigy Communications Corp. ("Prodigy"), through its business activities as an Internet Service Provider ("ISP"), directly infringes claims 3, 5, 6, and 7 (the "Asserted Claims") of U.S. Patent No. 4,873,662 (the "Sargent Patent" or " '662 Patent"). BT also alleges that Prodigy induces and contributes to infringement by Prodigy subscribers who infringe the Sargent patent by accessing the Internet through the Prodigy service.

The Court has already construed the claims of the patent in its *Markman* Opinion. *British Telecommunications PLC v. Prodigy Communications Corp.*, 189 F.Supp.2d 101 (S.D.N.Y.2002) (*"Markman Op."*). Prodigy now moves for summary judgment of non-infringement under Rule 56 of the Federal Rules of Civil Procedure.

For the reasons stated below, I find that as a matter of law, no jury could find that Prodigy infringes the Sargent patent, nor that Prodigy contributes to infringement of the Sargent patent, nor actively induces others to infringe that patent. I therefore grant Prodigy's motion for summary judgment.

## Summary Judgment Standard

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

■ As a general rule, infringement is a question of fact. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985). However, summary judgment is appropriate if the court, drawing all reasonable inferences in favor of the patentee, concludes that no reasonable jury could find infringement. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

## RELEVANT LEGAL PRINCIPLES

### Infringement

Determining whether a device infringes another's patent is a two step process. First, the Court construes the claims to determine their scope and meaning. The Court did this in its *Markman* Opinion dated March 13, 2002. *British Telecommunications PLC*, 189 F.Supp.2d 101. The next step is to compare the allegedly infringing device against the claims as construed to determine whether the device embodies every limitation of the claims. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc).

■ A device literally infringes a patent, when it "embodies every limitation of the asserted claims." *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed.Cir.2000); *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir.1991). "Literal infringement of a claim exists when each of the claim limitations 'reads on,' or in other words is found in, the accused device." *Allen Engineering Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336 (Fed.Cir.2002) (citing *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed.Cir.1995); *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1562 (Fed.Cir. 1996)).

■ Even if a device does not literally infringe a patent, it may still infringe under the doctrine of equivalents. Infringement under the doctrine of equivalents applies when there are insubstantial differences between the claimed invention and the accused product. If an allegedly infringing device performs substantially the

same function as the patented invention, in substantially the same way, to yield substantially the same result, it may infringe under the doctrine of equivalents. *Warner–Jenkinson Co.,* 520 U.S. at 21, 117 S.Ct. 1040; *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Atlas Powder Co. v. E.I. duPont De Nemours & Co.,* 750 F.2d 1569, 1579 (Fed.Cir. 1984). The doctrine of equivalents focuses on the "role played by each element in the context of the specific patent claim." *Warner–Jenkinson Co.,* 520 U.S. at 40, 117 S.Ct. 1040.

Whether infringement is established literally or under the doctrine of equivalents, every element, or its substantial equivalent, set forth in claim must be found in the product in question. *See Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 935 (Fed.Cir.1987). No structural or functional limitation in the claim may be ignored. *Warner–Jenkinson Co.,* 520 U.S. at 25, 117 S.Ct. 1040.

The Supreme Court recently clarified the law regarding the doctrine of equivalents in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* —— U.S. ——, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). In *Festo,* the patentee held a patent on a magnetically coupled, rodless cylinder used in machinery. *Id.,* 122 S.Ct. at 1835. As often occurs, the patentee amended the claims of the patent during the prosecution. *Id.* The amended claims stated that the invention contained a pair of sealing rings, each with a lip on one side to prevent impurities from getting onto the piston assembly. The amendment also added that the outer shell of the device would be made of a magnetizable material. *Id.*

SMC began making a similar device that differed from Festo's patent in two ways: it had one sealing ring with a two-way lip instead of two sealing rings with a one-way

lip, and the outer shell of SMC's device was made of a non-magnetizable material. Festo claimed that SMC infringed its patent under the doctrine of equivalents.

SMC asserted that prosecution history estoppel prevented Festo from claiming that equivalents infringed its patent, because the additional recitations in the amendment narrowed the claim to embrace only devices that included those elements. Prosecution history estoppel requires that patent claims be interpreted in light of the proceedings before the Patent and Trademark Office leading to the issuance of a patent, and precludes the patentee from claiming any interpretations of its patent that were "cancelled or rejected" during the course of the prosecution of the patent. *Id.,* 122 S.Ct. at 1838. If a patentee chooses to amend his claims in light of a patent examiner's rejection, then the patented invention does not encompass the original claim that was rejected by the examiner. *Id.* (citing *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 228, 26 L.Ed. 149 (1880); *Wang Labs., Inc. v. Mitsubishi Elec. Am., Inc.,* 103 F.3d 1571, 1577–78 (Fed.Cir.1997)).

Festo argued that prosecution history estoppel applied only when narrowing amendments were made for substantial reasons relating to patentability—for example, when the applicant made the amendment to avoid prior art, but not when an amendment was made for the sake of form. *Id.* at 1839, 122 S.Ct. 1831. In a controversial decision, the Federal Circuit disagreed, finding that any narrowing amendments made during the patent prosecution foreclosed the patentee from arguing that equivalents infringed elements of their patent, even if the amendment was not made for patentability reasons. *Id.,* 122 S.Ct. at 1835.

The Supreme Court disagreed, and held that narrowing amendments made during

the prosecution process did not automatically prevent the patentee from claiming equivalents. However, it ruled that narrowing amendments create a rebuttable presumption that they were made in order to obtain the patent. The patentee may then overcome this presumption, but only by demonstrating that the amendments were made for some reason. If he succeeds in rebutting the presumption, there is no bar to his invoking the doctrine of equivalents; if he fails, the doctrine of equivalents cannot be applied to that claim.

The Supreme Court's *Festo* decision reaffirmed the rule announced in *Warner–Jenkinson* that prosecution history estoppel applies only where claims have been avoided for a "substantial reason related to patentability," such as to avoid prior art or to address a specific concern such as obviousness. *Festo*, 122 S.Ct. at 1839 (quoting *Warner–Jenkinson*, 520 U.S. at 30–32, 117 S.Ct. 1040). Under its ruling, whether prosecution history bars the patentee from claiming equivalents is to be examined on a case-by-case basis:

> By amending the application, the inventor is deemed to concede that the patent does not extend as far as the original claim. It does not follow, however, that the amended claim becomes so perfect in its description that no one could devise an equivalent. After amendment, as before, language remains an imperfect fit for invention. The narrowing amendment may demonstrate what the claim is not; but it may still fail to capture precisely what the claim is. There is no reason why a narrowing amendment should be deemed to relinquish equivalents unforeseeable at the time of the amendment and beyond a fair interpretation of what was surrendered. Nor is there any call to foreclose claims of equivalence for aspects of the invention that have only a peripheral

relation to the reason the amendment was submitted. The amendment does not show that the inventor suddenly had more foresight in the drafting of claims than an inventor whose application was granted without amendments having been submitted. It shows only that he was familiar with the broader text and the difference between the two. As a result, there is no more reason for holding the patentee to the literal terms of an amended claim that there is for abolishing the doctrine of equivalents altogether and holding every patentee to the literal terms of the patent.

*Id.*, 122 S.Ct. at 1840–41.

■ The Court noted that *Warner–Jenkinson* struck the appropriate balance between flexibility and certainty when it placed on the patentee the burden of proving that the amendment was not made for the purposes of patentability. If the patentee cannot provide this explanation, the court will presume that the amendment was for a substantial reason related to patentability, and prosecution history will preclude any reliance on equivalents for the amended element. *Id.*, 122 S.Ct. at 1841–42. So strong is the presumption that, "[W]hen the court is unable to determine the purpose underlying a narrowing amendment—and hence a rationale for limiting the estoppel to the surrender of particular equivalents—the court should presume that the patentee surrendered all subject matter between the broader and the narrower language." *Id.*, 122 S.Ct. at 1842.

## Contributory Infringement

Under 35 U.S.C. § 271(c), one who sells a component of a patented invention or a component used in a patented process is liable for infringement as a contributor if: (1) the component is a material part of the

patented invention, (2) the seller knows the component is specifically made or adapted for use in an infringement of the patented invention, and (3) the component is not a staple article of commerce suitable for substantial noninfringing use.

■ Knowledge that one's activity causes infringement is necessary to establish contributory infringement. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469–70 (Fed.Cir.1990). Absent proof of direct infringement, there can be no contributory infringement or inducement of infringement. *Met–Coil Sys. Corp. v. Korners Unltd., Inc.*, 803 F.2d 684, 687 (Fed.Cir.1986).

### Active Inducement

■ A claim of active inducement under 35 U.S.C. § 271(b) requires the plaintiff to prove that the accused infringer knowingly aided and abetted another's direct infringement of the patent. *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1306 (Fed.Cir.1999). "Proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement." *Hewlett–Packard Co.*, 909 F.2d at 1469. "It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement." *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed.Cir.1990). The plaintiff must demonstrate that the alleged infringer induced the infringing acts and that "he knew or should have known his actions would induce actual infringements." *Id.*

### The Sargent Patent

The Sargent Patent describes a system in which multiple users, located at remote terminals, can access data stored at a central computer. (*Markman Op.* at 105–06.)

The data is received by the remote terminals via the telephone lines.

The information accessed by the remote terminals is stored on the central computer in the form of blocks, each block identified by a complete address. The central computer uses the complete address to retrieve the block identified by that address from storage when a user requests it. Each block stored on the central computer is comprised of two parts: a first portion, which contains textual and graphical data for display (a display page), and a second portion, not intended for display, which contains the complete addresses of other blocks of information that are related to the current display page. (*Id.*) The two portions of information are stored together—indeed, next to each other—yet they can be separated from each other. (*Id.* at 115–16.) For a given block of information, the displayed (first) portion references other blocks of information, while blocks in the second portion of the block of information contain the complete addresses. (*Id.* at 115–16.)

In the asserted claims, the entire block is transmitted to the remote terminal where the first portion is displayed and the second portion is stored in the local memory. The display page includes abbreviated addresses for particular blocks of information that can be accessed from the central computer. When the user selects one of the displayed abbreviated addresses from the first (displayed) portion of the block, the terminal accesses the second portion of the block from its memory to determine the corresponding complete address. That complete address is then sent via the modem to the central computer to obtain the next desired block of information. (*Id.*)

### BT'S ARGUMENTS IN MACRO

BT argues that Prodigy infringes the Sargent patent through its business activi-

ties as an Internet Service Provider. BT contends that Prodigy's web servers provide access to information in a manner that literally infringes the Sargent patent.

BT also alleges that the Internet infringes the Sargent patent and that Prodigy facilitates infringement by its subscribers by providing them with access to the Internet. BT contends that Prodigy contributorily infringes or actively induces the infringement of the Sargent patent by providing the necessary software and encouraging its subscribers to access pages of information from Web servers maintained by third parties. Therefore, BT argues, even if Prodigy's servers do not infringe the Sargent patent as a matter of law, summary judgment should be denied because Prodigy infringes the '662 patent by making and using infringing remote terminals.

## UNDISPUTED FACTS

### The Internet

The Internet is a network of computer networks that links millions of public and private computers to form the largest computer network in the world. (Prodigy's Local Rule 56.1 Statement ¶ 1 ("Prodigy's Undisputed Facts"); BT's Local Rule 56.1 Statement ¶ 1 ("BT's Undisputed Facts"); Wah Report ¶¶ 22, 23; Clarke Decl. ¶ 6.) It enables millions of people to obtain and share information electronically. The World Wide Web is a collection of Web pages that are linked together on the Internet. (Wah Report at ¶ 22.)

The Internet relies on several mechanisms to make Web pages available to a vast audience. (Wah Report ¶ 25; Clark Decl. ¶ 6.) These mechanisms include: (1) a uniform naming scheme for locating resources on the World Wide Web, such as the Uniform Resources Locator Standard ("URL"); (2) protocols for access to

named resources over the World Wide Web, such as the Hypertext Transfer Protocol ("HTTP"); and (3) HyperText Markup Language ("HTML"). (Wah Report ¶ 25; Clark Decl. ¶ 6.)

HTML is the language in which Web pages are formatted. (Wah Report ¶ 24 (citing *A Beginner's Guide to HTML*, NCSA).) This language is a kind of "publishing mother tongue that all computers may potentially understand." (*Id.* ¶ 22). HTML allows authors to mark up a document by representing structural, presentational, and semantic information adjacent to the content. (*Id.* ¶ 23.) In HTML, a mark up element is called a tag. These tags include, for example, paragraph separators, text treatments (e.g. bold, italic, etc.), and hyperlinks. (*Id.*) HTML files may or may not include instructions, including a programming language called JavaScript. (BT's Undisputed Facts ¶ 15; Wah Report ¶ 169.)

HTML files are stored in computers called Web servers. (Wah Report ¶ 24.) A Web server "serves" up Web pages to Web browsers upon request. (*Id.*) A user looking to access an HTML file stored in a Web server requires a personal computer ("PC") with software called a Web browser. (*Id.*)

A hyperlink points to the URL for a Web page. (*Id.* ¶ 27.) Hyperlinks often take the form of a colored text (such as a URL description), logo or image that is displayed on the screen. When a user clicks on the highlighted word or icon, she is sent to the URL requested, or receives more information about what she clicked on.

URLs are identifiers that are used to locate resources on the Internet, such as HTML files stored on a Web server. (BT's Undisputed Facts ¶ 3; Wah Report ¶ 26; Clarke Decl. ¶ 7.) A URL is a compact representation of the location and ac-

cess method for a resource that is available through the Internet, generally consisting of three pieces of information: (1) the access method, (2) the name of the server where the Web page is stored, and (3) the name of the page itself within the server, which may be depicted as a path. (Wah Report ¶¶ 26, 28.)

For example, in the URL *http://www.prodigy.net/a/b/c.html:*

- "http" is the access method. This identifies the communications service. These include hypertext transfer protocol ("http"), file transfer protocol ("ftp"), gopher, mail, etc.

- *www.prodigy.net* identifies the Web server. Names of this form are called DNS names. The Web system makes use of the Internet Domain Name Service, which translates the name of a machine on the network into an Internet address

- a/b/c.html identifies the desired page within the server

(Wah Report ¶ 29; Clarke Decl. ¶ 7.)

When a user requests an HTML file, the browser sends a request to a Web server via the telephone lines. (Wah Report ¶ 32.) The Web server retrieves the file and sends it back to the user's browser. (*Id.*) The browser then reads and interprets the HTML file and displays the Web page on the user's PC screen. (*Id.* ¶ 96.)

Web browsers and Web servers communicate using the TCP/IP protocol. (*Id.* ¶ 32.) This is a request/response protocol—when a Web page is requested, the Web browser sends a request to the Web server. (*Id.*) This request includes a portion of the URL for the requested Web page and the version of the HTTP protocol being used. The Web server responds to the request by sending the contents of the requested Web page to the computer on which the Web browser resides. (*Id.*)

A Web browser must first establish a connection with a Web server through a network before it can obtain a file from the Web server. (*Id.* ¶ 33.) Typically, this connection is established on the Internet via a TCP/IP connection. (*Id.*) To establish a TCP/IP connection, the transport-layer protocol software initiates a request to connect to a special protocol port of the Web server. (*Id.* ¶ 34.) If the address of the Web server is specified as an IP address in the URL for the requested page, then the computer running the Web browser initiates a request to resolve the domain name into an IP machine address name. (*Id.*) Once the TCP connection is made, the Web browser can send repeated Web page requests to the same server without making a new connection. (*Id.*)

Under the current Internet Protocol system, each machine connected to an Internet Protocol ("IP") network is addressed using a 32 bit number, the IP address. These addresses are usually written in "dotted quad" notation, as a series of four 8 bit numbers, written in decimal and separated by periods. For example, an IP address might appear as 151.126.95.10. (BT's Counter to Undisputed Facts ¶ 19.) Many machines have more than one IP address. For example, a machine hosting multiple websites often has an IP address for each website it hosts. Other times, a pool of IP addresses is shared between a number of machines— e.g. on a dynamic IP dialup connection such as the Prodigy Internet Service, a subscriber's machine will be allocated a different IP address each time the subscriber connects. (Clark Decl. ¶ 12.)

**The Prodigy Service**

Prodigy is an Internet Service Provider ("ISP") that has supplied its customers with access to the Internet since October, 1996. (Prodigy Form 10–K for the period ended Dec. 31, 2000, Exh. B to Decl. of

Benjamin Hershkowitz ("Form 10–K")) Prodigy's services include dial-up access, and broadband DSL access service. (*Id.*) Prodigy's networks can provide dial-up access, using a local telephone call, to approximately 90% of the households in the United States. (*Id.*)

According to Prodigy's form 10–K, "Prodigy has a variety of arrangements to acquire customers, including ... contract acquisition programs with selected major PC manufacturers; bundling [connection and browser software] with PCs shipped by leading PC manufacturers; ... includ[ing] Prodigy software with every copy of Windows 98 and Windows 2000 for sale in retail channels; ... direct mail and telemarketing...."(*Id.* at 3.) Prodigy has extensive customer support services to assist members "including toll-free support, various online support options and online members helping members program." (*Id.*) The technical support is available so that "customers are assisted with Prodigy software installation," among other things. (*Id.* at 4.) Prodigy provides its customers with a series of products and services containing everything necessary to access the Web.

When a new subscriber seeks to use the Prodigy Internet Service, Prodigy provides the subscriber with a CD containing a Client Kit Software package to install on the subscriber's PC.[1] (Wah Report ¶ 48 (citing Bhakta Dep. at 138; Exh. F, Prodigy Internet).) This kit includes software that enables a member to dial through a modem into Prodigy's Web server and includes a copy of the Microsoft Internet Explorer version 5.5 Web browser. (*Id.* (citing Bhakta Dep. at 138–39).)

Prodigy's subscribers connect their PCs to the Prodigy network using local, toll-free or long distance telephone service. (Wah Report ¶ 51) (citing Form 10–K, Exh. 51.) Subscribers then have access to the Internet and to Prodigy's hosting servers. (*Id.*) The hosting servers store some of the data accessed during subscriber sessions. (*Id.*) Network connections are made through communications hardware such as telephone lines, routers, switches, and modems. (*Id.*)

When a user dials in to the Prodigy system, the user's computer is assigned an IP address dynamically by Prodigy. (Wah Report ¶ 53) (citing Bhakta Dep. at 34–41.) An IP address is a unique binary number assigned to an interface connection of a computer to the Internet and is used by the other computers to send packets using the IP protocol to this computer. The member can then use the Web browser to retrieve Web pages from the Prodigy Web site or from other Web servers connected to the Internet. (Wah Report ¶ 53.)

Prodigy subscribers receive access to the Internet and Prodigy-branded content and services such as personal Web pages, called "the Prodigy Personal Web Page." (Form 10–K.) Prodigy customers may create their own Web pages through this service. (Bhakta Dep. at 14–15.)

The network infrastructure used by Prodigy consists of three primary tiers: local phone access sites; a middle tier, which connects local phone access sites to regional hubs; and a backbone tier, which connects the regional hubs to the Internet or Prodigy's data hosting center. (Wah

---

1. The minimum system requirements suggested for a PC to run Microsoft Internet Explorer version 5.5 SP2 under Microsoft Windows 95 includes a 66 megahertz (MHz) Intel 486 processor, 16 MB of RAM, a Microsoft or compatible mouse, and a modem or Internet connection. (Wah report ¶ 50 (citing *Internet Explorer 5.5 Service Pack 2 and Internet Tools*. Microsoft Windows: URL:http//www.microsoft.com/ windows/ie/downloads/recommended/ie55sp2/default.asp.).)

Report ¶ 41 (citing Form 10–K, Exh. 51).) Prodigy's data-hosting center, located in New York, houses approximately 400 high-capacity servers to store content and other data. (*Id.*) Prodigy's data center contains Web servers and data banks that process and store the Web pages for Prodigy's Web sites, which include *www.prodigy.net, www.prodigy.biz,* (for Prodigy's business customers) and *pages.prodigy.net* (for Prodigy members' personal web sites). (Bhakta Dep. at 33.)

Prodigy uses nine servers to help distribute the load of multiple subscribers' accesses. (Prodigy's Statement of Undisputed Facts ¶ 24.) Each of these servers has the same content. The content is information related to Prodigy's web pages, for example, *www.prodigy.net, www.prodigy.biz.* (Bhakta Dep. at 37.) Prodigy also uses three additional Web servers to service its subscribers' Personal Web pages. (*Id.* at 38.) These servers share a copy of all of the personal web pages for *www.prodigy.net. (Id.)*

When a Prodigy member makes a request to any URL on the Prodigy portal, such as *www.prodigy.net.,* which is the URL of the Prodigy main portal page, or "home page," the member's browser first makes a request to the DNS service to get the IP address that corresponds to this URL, either from local information or from querying servers on the Internet. If found, the IP address that the DNS server returns to the browser points to a load balancing server. This load balancing server is a separate physical computer running the IBM Network Dispatcher® software. It distributes Prodigy user requests to one of the content servers based on the traffice on each of these servers. The load-balancing computer has no data store that is accessed by Prodigy users. (Bhakta Decl. at ¶¶ 5, 6.)

Prodigy uses a set of three additional Web server computers to service its members' personal Web pages located at *pages.prodigy.net.* (Wah Report ¶ 45) (citing Bhakta Dep. at 38.) These Web pages are stored on a network file system. (*Id.* (citing Bhakta Dep. at 38–39).) Each Web server accesses the same network file to retrieve a requested personal Web page. (*Id.*)

Prodigy employs a Netscape server plug-in to convert or map directly each personal Web page address into its disk file name address using a hashing algorithm. (Wah Report ¶ 46 (citing Bhakta Dep. at 39–41).) The hashing algorithm takes member-specific alphanumeric information, such as the login name of the member, and generates a number using a mathematical algorithm. (*Id.* (citing Bhakta Dep. at 42).) This number is then combined with the Web page address to obtain the Web page from the network file system. (*Id.*)

### BT's ARGUMENTS IN MICRO

BT contends that:

1. Each Web server on the Internet is a "central computer" as defined in the Sargent patent because each Web server has its own centralized data store.

2. HTML files qualify as "blocks of information" either literally or under the doctrine of equivalents.

3. Each URL address is a "complete address" within the meaning of the Court's construction of the term, either literally or under the doctrine of equivalents.

BT makes other arguments[2] but it is not necessary to reach them because its

---

**2.** BT also argues that in PCs, the first and second portions of blocks of information are

failure to raise any disputed issue of fact as to these points means that Prodigy is entitled to judgment as a matter of law.

## DISCUSSION

### I. The Internet Does Not Infringe the Sargent Patent

#### A. The Internet Has No "Central Computer"

##### 1. Literal Infringement

■ A "central computer" in the Sargent patent is:

> a single device, in one location. It is referred to as "central" because it is connected to numerous physically separate stations, called "remote terminals," by the telephone lines of a telephone network. So there is one computer, connected to many remote terminals. The central computer means in this patent thus serves as the hub of a digital information storage, retrieval and display system—and all of the remote terminals connect to it.

> The central computer stores information. The central computer contains a "main store." In the context of this patent, the main store is a mass information storage or memory device. An example of a main store is a magnetic disk, which is a rotating circular plate having a magnetizable surface on which information may be stored as a pattern of polarized spots on concentric recording tracks.

The central computer contains an information database, which is "centralized" in the sense that all of the remote users can access it by accessing the central computer.

(*Markman Op.* at 112.)

BT asserts that, while the Internet is made up of an enormous number of computers, each individual web server is a central computer in one location (i.e. central relative to the remote terminals within the meaning of the patent). (Wah Decl. at ¶ 31.)

The cornerstone of this argument is BT's assertion that a central computer is not limited to a single computer as a matter of law. To support its position, BT quotes a statement I made in *TM Patents, L.P. v. Int'l Business Machines Corp.*, 72 F.Supp.2d 370, 380 (S.D.N.Y.1999) while construing the claim term "a multi-unit memory system:"

> Of course, the fact that the patent claims "a" system does not mean that IBM or some other party would escape liability for infringement by constructing two or three or even more such multi-unit memory systems and somehow linking them together or causing them to operate together.

*Id.* at 380. The flaw in BT's cornerstone argument is obvious. Not only was I not construing the Sargent patent in TM, I was not even construing the term "central computer" when I wrote those words. I was construing the word "system." [3] A

---

separated and stored in separate memories (or the separation and storage of HTML files is substantially similar to the separation and storage of blocks of information); a computer mouse is a keypad means and it provides for manual entry of keyed digital data; and a URL is not intended for display (or the URLs in the second portion of an HTML file are substantially similar to the second portion of a block of information).

3. Moreover, I was doing so in the context of a patent that is not even *remotely* like the Sargent patent. The quote is taken from the Court's construction of the '342 patent. That patent is for a computer system that is able to detect and correct errors in data stored in the computer. The system uses an error correction code with the capacity not just to detect errors in data but to correct them as well, and spare disk drives to back up the corrected

system is not the same thing as a computer, and I never said that it was. A computer, according to the dictionary, is "a device that receives, processes and presents data," Dictionary of Scientific and Technical Terms 342 (Sybil P. Parker ed., McGraw Hill 3d ed.1984), while a system is "a combination of several pieces of equipment integrated to perform a specific function" or "a group of related structures." *Id.* at 1600. Thus, the word "system" fairly implies multiple devices connected together. The Sargent patent does indeed cover a system, one that *includes* a central computer as one of its elements. BT conflates the system with the computer. But I made it clear in the *Markman* opinion (as the Sargent patent claims make clear) that the computer is but one component of the system.

The patent claims as construed clearly provide that the central computer is one device, in one location. (*Markman Op.* at 112–13.) Just as a circle has but one center, hub-and-spoke networks have only a single hub. There may be other circles with other centers, just as there may be other hub-and-spoke networks with other central computers or hubs. But each system (network) of the type claimed in the Sargent patent can have only one central computer. Therefore, viewing the Internet as a system (as BT asks me to do), it does not literally infringe the Sargent patent, because it contains no such central computer.

The central computer in the Sargent patent also contains an information database, which is "centralized" in the sense that all remote users can access it by accessing the central computer. (*Id.*) Prodigy argues that the Internet has no such "centralized data store," but rather, contains an extremely diffuse data storage architecture. According to Prodigy's expert, this distribution is the essence of the Internet, because it allows users to access information stored throughout a global network of networks of computers and storage devices that are loosely linked through adherence to an open group of protocols and standards adopted by the Internet community. (Clark Decl. at ¶ 6.)

BT does not dispute that this is the case. It responds, however, that its argument is not that the Internet has a centralized data store, but that each Web server (or central computer, as BT would call it) has its own centralized data store because it has a main storage device for storing HTML files. (Wah Decl. at ¶¶ 31–33; Wah Report ¶ 176.)

However, the claims of the '662 patent state that the centralized data store contains *all* of the blocks of information accessible by the remote terminals. (*Markman Op.* at 115.) BT does not dispute that there is no centralized data store for the Internet that contains all of the data remote users might care to access.

The Internet is a network of computers intertwined with each other in order to allow users around the world to exchange information. The whole purpose of the Internet is for the *sources* of information to be in many places rather than centralized. Any user can retrieve information that is stored on a Web server in any physical location, as long as that server is connected to the Web. For example, a Prodigy user does not have to rely on Prodigy to gather information from multiple sources and put it on its own server in order for a Prodigy customer to have access to the information. Rather, when Prodigy users connect to the Internet through Prodigy's system, users can access blocks of information located on remote systems, e.g. a computer in Alaska,

data, so that there are always two copies in the system.

rather than Prodigy's own computers in New York. This "network of networks" or "system of systems" allows users access to information from a variety of sources, in any location.

BT cites the general rule that addition to an accused apparatus of one or more features than the claim requires does not preclude a finding of infringement. But what BT characterizes as "additions" are fundamental differences in the nature of the claim elements. As it did during the *Markman* hearing, BT would have me exclude the word "central" from the construction of "central computer." The Court expressly rejected BT's interpretation by ruling that the Sargent patent claims a central computer that is a single computer with a centralized database. Because the Internet is not a computer network consisting of a centralized computer that stores all of the data accessible by remote terminals, Web servers on the Internet cannot literally infringe the '662 patent.

## 2. Doctrine of Equivalents

BT may not rely on the doctrine of equivalents to withstand Prodigy's motion for summary judgment. The doctrine of equivalents requires insubstantial differences between the patented invention and the accused product, as determined on an element-by-element basis. *Warner–Jenkinson*, 520 U.S. at 29–30, 117 S.Ct. 1040. Whether the differences are insubstantial can be determined by the function-way-result test, which requires that the claimed and accused elements "perform substantially the same function in substantially the same way to obtain the same result." *Id.* at 40, 117 S.Ct. 1040; *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc.,* 285 F.3d 1046, 1053 (Fed.Cir.2002) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609, 70 S.Ct. 854,

94 L.Ed. 1097 (1950)). In this case, the Internet fails the function-way-result test, because a central computer containing all of the data accessible by a remote terminal user operates in substantially different ways from the Internet.

A central computer, as claimed in the Sargent patent, has a one-to-one, hub and spoke relationship with numerous physically separate stations called remote terminals. The remote terminals are connected to the central computer by the telephone lines of a telephone network. All of the remote terminals connect to the central computer that has one centralized main store for storing information. (*Markman Op.* at 111–12.) As a result, a remote terminal in the Sargent patent does not identify in its communication protocol a computer with which it would like to communicate, for it communicates with only one central computer. In contrast, a computer operating on the Internet must at all times identify a specific computer with which it seeks to communicate, because not all of the remote users are connected to a single central source of information. If all Internet users were connected to Prodigy's Web server alone, BT's argument might have some force; but all Internet users are not connected to Prodigy. Instead, Internet users have access to multiple Web servers on the Internet that store information in various locations.

Indeed, the Internet is the very antithesis of a digital information storage system having a central computer. The opposite of a claim limitation cannot be considered its equivalent. *Moore U.S.A. Inc. v. Standard Register Co.,* 229 F.3d 1091, 1106 (Fed.Cir.2000). In *Moore,* the Federal Circuit held that a claim limitation reciting that an adhesive "extend[s] the majority of the lengths of said longitudinal marginal portions," could not be infringed either

literally or under the doctrine of equivalents by a product having adhesive extending only a minority of a marginal portion (i.e. less than 50%)—even if it was almost a majority (e.g., 47.8%) *Id.* According to the Federal Circuit, "it would defy logic to conclude that a minority—the very antithesis of a majority—could be insubstantially different from a claim limitation requiring a majority." *Id.*

BT cannot dispute that any user throughout the world can access information stored in any of the millions of computers connected to the Internet. In contrast, the Sargent patent claims revolve around a central computer—a single device, in one location, with one main data store. The Internet, is, in short, an entirely different beast from the system described in the Sargent patent. Consequently, the Internet does not infringe the Sargent patent either literally or under the doctrine of equivalents. Prodigy is therefore entitled to summary judgment as a matter of law.

### B. The Phrase "Central Computer" Limits Claims 5, 6, and 7

BT argues in its Opposition Brief that "central computer" does not limit claims 5, 6, and 7. BT relies on *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 808 (Fed.Cir.2002), and *Rowe v. Dror,* 112 F.3d 473, 478 (Fed.Cir.1997), for the proposition that "a preamble [is] not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'"

However, *Catalina* and *Rowe* are of little help to BT because limitations in the preamble may in fact limit the claim terms if the "patentee uses the claim preamble to recite structural limitations of his claimed invention." *Rowe v. Dror,* 112

F.3d at 478. In the patent at issue, the phrase "central computer" is not merely a term that appears in the preamble of the Sargent patent to describe the purpose of the patent. This term appears in the body of the Sargent claims as well, and recites structural limitations of the patent.

In *Catalina,* the Federal Circuit ruled that:

> While the phrase "located at predesignated sites such as consumer stores" appears only in the preamble of Claim 1, this language appears both in the preamble and body of Claim 25. Hence, the applicants specifically included this language in the claim not once, but twice. By virtue of its inclusion in the body of Claim 25, the phrase limits Claim 25.

289 F.3d at 810–11; *see also Karsten Mfg. Corp. v. Cleveland Golf Co.,* 242 F.3d 1376, 1380 (Fed.Cir.2001) (finding that preamble term limited claim because the term was used in the specification as well as in all of the claims).

The term "central computer" appears both in the preamble and the body of claim 5 of the Sargent patent. Indeed, "central computer" appears three times in the body of claim 5. Since claims 6 and 7 depend upon claim 5, these claims are also limited by anything that limits claim 5. Indeed, the Court's *Markman* opinion makes clear that the terminals claimed 5, 6, and 7 must be used in a system that includes a "central computer," as defined in claim 3. (*Markman Op.* at 130.)

Furthermore, the Sargent applicant repeatedly distinguished the prior art during the prosecution of claims 5–7 by pointing to the claimed novelty of the two-part block of information and the manner in which such blocks were stored and accessed from the central computer's main store. (Applicant's Appeal Br. dated Jan.

5, 1987.) Thus, unless a Prodigy user's PC is used in a system in which a central computer exists—or at a minimum is specially adapted for use in such a system—there can be no infringement of the Sargent patent.

BT's argument that the phrase "central computer" does not limit claims 5, 6, and 7 is thus without merit.

### C. The Internet Does Not Contain Blocks of Information as Required by the Sargent Patent

#### 1. Literal Infringement

A key distinction between the '662 patent and the Prodigy Internet Service is the requirement of the '662 patent that information be stored as blocks of information. These blocks have special characteristics:

Each block has a first portion and a second portion. These portions are separable, contiguous and co-stored sub-units. That means that the portions are stored together, and they are stored next to each other, yet they can be separated from each other. A block of information may contain very limited programming information, the purpose of which is to reduce the complexity of keying required to communicate with the central computer.

The two parts of a block of information are the first portion and the second portion. The first portion of a block of information is intended for visual display on a remote terminal. The second portion is information not intended for display. The second portion contains the complete address for each of the other blocks of information referenced in the first portion. So if a block of information is referenced in the first portion, then the complete address for that block of information will be in the second portion. The second portion may also con-tain other information as well, such as information to influence the display or to reduce the complexity of keying required to communicate with the central computer. But it never contains information intended for display. ·

(*Markman Op.* at 115.)

Unlike the blocks of information required by the '662 patent, HTML code, which is the primary language of the World Wide Web and of the Prodigy Internet Service, does not use blocks. HTML code does not separate displayed information into a first sub-unit, and non-displayed information in a contiguous, separable second sub-unit. Rather, HTML code contains information to be displayed intermingled with other information concerning formatting and linking, such as URLs and anchors.

In HTML, hypertext references include each URL link adjacent to each phrase or image for display. For example, in the code,

<script>document.write (HTMLCache-Array[34]; </script><A href=*'http:// www.msnbc.com /modules/exports /ct— prodigy.a sp?/news/736921.asp'* target='—top'>**Yahoo! profits meet forecasts** </A><TD>

the information for display is shown in bold, and the URL is shown in italics. The first linking tag (which is referred to in HTML as an "anchor tag," and identified with the "<A"), is the information always for display associated with each URL. This information appears on the screen. The user can mouse this link, and click to activate it. The URL for each such component of displayed information is set forth in the HTML code immediately prior to the information for display. Consequently, URLs associated with information for display are not located contigu-

ously and separably with a sub-unit of information not for display.

BT argues that the Court's construction of "blocks of information" does not require that the displayed and non-displayed information be co-stored as separate and discrete contiguous sub-units, but merely requires that the portions be separable. (BT Opp.Br. at 20.) It bases this argument on the Court's omission of the word "segregated" from its construction of the term "blocks of information." But the requirement that the first and second portions not be "intermixed" was very much a part of the Court's claim construction:

> Prodigy asks me to incorporate the word "segregated" into the construction, relying on the same passage from the 1986 Amendment and the 1987 Appeal Brief, (Jan. 24, 1986 Appeal Br. at 3; Jan. 5, 1987 Appeal Br. at 3; File Wrapper Tab 22), to clarify that the portions may not be intermixed. While the word "segregated" does appear in the specification and the prosecution history, I am not aware of any rule of patent construction that requires me to incorporate each and every word ever used in conjunction with a patent claim in the claim construction. The parties have not suggested any meaning for "segregated" that makes it integral to the definition of the term "block of information." The very idea of the block's two discrete subparts—the first and second portions—incorporates the notion of segregation or separability, and I have already decided to include separability in the definition. It will unnecessarily confuse the jury to incorporate a second word that means much the same thing.

(*Markman Op.* at 117.)

During the *Markman* phase, the Court expressly rejected BTs contention that the terms "co-stored" and "contiguous" in the Sargent patent are synonymous. (*Markman Op.* at 116–17.) While I did not include the word "segregated" into the explanation of "blocks of information" that I would have given to the jury, I did this because I had already included the word "separable" into the definition and did not want to confuse the jury by including a second word that, to me, meant the same thing. The word "segregated" was omitted from the definition of "blocks of information" because it appeared to me to be duplicative of the term "separable," not to remove from the claim the fact that the sub-portions are not intermingled.

Alternatively, BT's expert, Dr. Wah, states that it is possible to create HTML files so that "they have a top portion containing only information for display and a bottom portion containing only information not for display but including the complete assigned address for another HTML file stored on the same server." (Decl. of Benjamin Wah at ¶ 22.) He illustrated his argument in two ways. Neither is persuasive.

First, Doctor Wah created web sites that he alleged were infringing and placed them on Prodigy's system.[4] BT cannot claim that Prodigy infringes its patent, or induces others to infringe its patent, if it must invent the infringing device itself. "A device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Medical Instrumentation v. New Image Indus., Inc.,* 49 F.3d 1551, 1555 (Fed.Cir.1995) (finding that a camera that was "rigidly coupled to its housing" did not infringe a device that

---

4. There is some dispute about who created these files. However Dr. Wah testified that he loaded them onto Prodigy's system with the assistance of BT's counsel. (*See* Prodigy's Supp.Mem. in Supp. of Summ.J. at 1–2.)

claimed a rotating camera, since the screws on the accused infringing camera would have to be loosened in order for it to rotate like the patented device).

An example of this well-established rule of patent law is found in *Bionx Implants, Inc. v. Linvatec Corp.*, 99 F.Supp.2d 396, 396–99 (S.D.N.Y.2000). In that case, the plaintiff held a patent on a small plastic suture used to repair tears in the menisci of the knee. The accused infringer marketed a suture that was similar to the patented device but was made of a flexible material and had a hole running through the interior of the suture. The court found that the claims of the patent described a device that was rigid. The applicant distinguished his suture from prior art because the other suture was made of a flexible material that could not "by itself be pushed into a body tissue without the use of a needle." *Id.*

In support of its position that the allegedly infringing suture was similar to the patented device because it could be pushed into the body without using a needle, the plaintiff submitted a videotape to · the court. In the video, they showed that the infringing device could be pushed into the meniscal tissue without first cutting the tissue. The court noted, however, that the insertion was only made possible by using a special insertion rod designed specifically for the video demonstration. The court found that this tactic violated the principle established in *High Tech Medical* that a device does not infringe because it can be made to infringe. "[T]he question is not what a device might have been made to do, but what it was intended to do and did do." *Bionx Implants*, 99 F.Supp.2d at 398 (citing *High Tech Medical*, 49 F.3d at 1555).

Second, Dr. Wah identified the "sheilagenealogy" page on Prodigy's system as containing a "block of information" as defined in the Sargent patent. (Wah Dep. at 41–42.) Unfortunately, for BT, this HTML file does not look remotely like the "blocks of information" claimed in the '662 patent. The Sargent patent requires that second portion contains the complete address for each of the other blocks of information referenced in the first portion. So if a block of information is referenced in the first portion, then the complete address for that block of information will be in the second portion. Dr. Wah acknowledged in his deposition that the parts that he identified as "second portions" did not contain multiple complete addresses. (*Id.* at 50–51.)

Dr. Wah further testified that, in order to create a "block of information" containing at least two complete addresses from HTML, one would have to link conceptually two distinct, bracketed "sub-blocks." Even after performing this conceptual reconfiguration of the HTML file, all of the HTML paragraphs containing URLs would have to be somehow connected in order for them to be configured as described in the Sargent patent. This is a far cry from the "neatly segregated block" the applicant discussed during the prosecution of the Sargent patent. (Applicant's Appeal Br. dated Jan. 5, 1987 at 12–13.) Consequently, I find, as a matter of law, that the HTML file that Dr. Wah presents as evidence of an infringing "block of information" according to the Sargent patent does not literally infringe the claims of the Sargent patent.

BT is correct that there is no requirement that its expert analyze every available web page that it claims qualifies as a block of information. However, in order to raise a disputed issue of material fact, BT must identify at least *one* web page other than one it invented for the purposes of this lawsuit. It has not done so. Other than BT's general assertion that blocks of information as defined in the Sargent pat-

ent exist on the Internet, BT has not presented any other evidence of an infringing Web page, on Prodigy's system or anywhere else on the Internet. Since the one example that Dr. Wah identified as an infringing Web page (other than the ones he created) does not literally infringe the Sargent patent, BT's expert's conclusory statement that there are infringing HTML files on the Internet does not raise a genuine issue of material fact precluding summary judgment. *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed.Cir.1998).

### 2. Doctrine of Equivalents

BT cannot rely on the doctrine of equivalents to withstand Prodigy's motion for summary judgment.

### a. Application of the Doctrine of Equivalents is Barred with Respect to "Blocks of Information" Because the Applicant Made Unmistakable Assertions to Avoid the Prior Art

 The doctrine of prosecution history estoppel prevents a patent owner from relying upon the doctrine of equivalents when the patent applicant relinquishes coverage of subject matter during the prosecution of the patent, either by amendment or argument. *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1376–77 (Fed.Cir.1999); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed.Cir.1995). A patentee cannot invoke the doctrine of equivalents to "embrace a structure that was specifically excluded from the claims." *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 400 (Fed.Cir.1994).

 During the prosecution of the Sargent patent, a new limitation was added to the phrase "blocks of information" in order to distinguish the Sargent patent from the Quinn,[5] Fedida,[6] and Cramer[7] references.[8] To distinguish the Quinn reference, for example, the Applicant cited to several of its narrowed claim limitations:

> For example, there is absolutely no suggestion anywhere in Quinn that blocks of stored data should include a first portion containing information for display and a second portion containing information not for display but including the complete address for each of plural other blocks of information. Nor does Quinn teach … manual entry of keyed digital data of less extent than any one complete address but nevertheless uniquely indicative of one of the complete addresses contained in the second portion of the block of information (which contains the first portion then being displayed).

(Jan. 26, 1983 Amendment at 9–10.)

Because BT relied on narrowing amendments to overcome prior art, equivalents are unavailable with respect to these claim

---

**5.** The Quinn reference, U.S.Pat. No. 3,688,-276, is a computer controlled vending and reservation system. In Quinn, a central computer controls remote vending machine terminals, and the computer acts as a memory storage for keeping inventory and accounts.

**6.** The Fedida "Viewdata" paper describes BT's Viewdata system.

**7.** The Cramer reference, U.S.Pat. No. 4,065,-810 describes a data transfer system allowing a terminal to use a modem to access data stored in a memory store.

**8.** Claim 19, which became issued claim 1 after subsequent amendments, introduced the limitation that the blocks of information contain the complete address for each of plural other blocks of information in the second portion of the block. This claim also introduced the "further memory means" limitation and the use of keyed digital data to select the next complete address.

limitations. *Warner–Jenkinson*, 520 U.S. at 33, 117 S.Ct. 1040. Thus, BT is barred from asserting that Prodigy's Internet service meets the above claim elements under the doctrine of equivalents.

Additionally, in order to overcome rejection for obviousness under 35 U.S.C. § 103, the Sargent applicant argued that the first and second portions of a block of information must be contiguous, co-stored, and co-addressed:

> *And* it must never be forgotten that *none* of the references specifically teach or suggest a system wherein each "screen" of displayed data is specifically associated with its own segregated but yet contiguously located and co-stored and co-addressed index for assisting in the address selection of the next screen of data to be displayed.

(Applicant's Appeal Brief dated Jan. 5, 1987 at 12–13 (emphasis in original).) Therefore, BT cannot now rely on equivalents for "blocks of information" to sustain a claim of infringement. This, too, was a narrowing of the original claim in order to obtain a patent.[9]

> b. Even if Prosecution History Estoppel did not Prevent BT from Claiming that Equivalents Infringed the Sargent Patent, Prodigy Would Still Be Entitled to Summary Judgment as a Matter of Law

Infringement under the doctrine of equivalents requires that the accused device perform substantially the same function to achieve substantially the same result in a substantially similar manner as the patented device. *Dolly*, 16 F.3d at 398. "The doctrine of equivalents is not a license to ignore claim limitations." *Id.*

(citing *Pennwalt Corp.*, 833 F.2d at 935). "The accused device must ... contain *every* limitation or its equivalent." *Id.* (citing *Intel*, 946 F.2d at 832).

HTML requires that displayed and non-displayed information be interspersed in a fashion that is entirely different from the separate sub-units claimed in the Sargent patent. This intermixing of displayed and non-displayed information not only differs substantially from the blocks of information claimed in the Sargent patent, it is the antithesis of the "neat" Sargent method. BT therefore cannot claim infringement of the Sargent patent under the doctrine of equivalents. *Moore U.S.A. Inc.*, 229 F.3d at 1106.

### D. The Phrase "Blocks of Information" Limits Claims 5, 6, and 7

 BT argues in its Opposition Brief that the phrase "blocks of information" does not limit claims 5, 6, and 7. "Blocks of information" applies to the patent for the same reasons that "central computer" applies. "Blocks of information" is not merely a term that appears in the preamble of the Sargent patent to describe the purpose of the patent. This phrase appears in the body of the Sargent claims as well, and recites structural limitations of the patent. "Blocks of information" appears five times in the preamble and five times in the body of claims. Since claims 6 and 7 depend upon claim 5, these claims are also limited by anything that limits claim 5.

Furthermore, the Sargent applicant repeatedly distinguished the prior art during the prosecution of claims 5–7 by pointing to the claimed novelty of the two-part block of information and the manner in which such blocks were stored and ac-

9. The Court did not need additional briefing from BT on this issue because *Warner–Jenkinson* remained the law, even before the Supreme Court re-affirmed its principles in *Festo*. *See Festo*, 122 S.Ct. 1831.

cessed from the central computer's main store. (Applicant's Appeal Br. dated Jan. 5, 1987.) Thus, unless a Prodigy user's PC is used in a system in which blocks of information are downloaded—or at a minimum is specially adapted for use in such a system—there can be no infringement of the Sargent patent.

BT's argument that the phrase "blocks of information" does not limit claims 5, 6, and 7 is therefore without merit.

E. Neither a URL Nor the Path Component of a URL is a Complete Address

1. Literal Infringement

■ All of the asserted claims of the '662 patent require that the complete address for each associated block of information that is referenced in the displayed portion be stored in the second portion:

the complete address is the entire number or name that uniquely identifies, without reference to other information, a location on the central computer's main store where a block of data will be found.

(*Markman Op.* at 115.)

As explained in the *Markman* opinion, a complete address is not a virtual address. (*Id.* at 120–21.) Virtual addresses are not complete addresses because they require reference to other information. "A complete address is … more than simply the address by which the central computer is able to retrieve a block of information. The complete address calls up the block of information directly, without reference to another address." (*Id.* at 121.)

Prodigy argues that a URL is not a complete address under the meaning of the Sargent patent because a URL does not convey the location of information on a particular computer. Instead, a URL requires additional information in order to pull up a web page from a server. When a browser accesses any content page on the World Wide Web, the browser first obtains the IP address of the server where the content resides before it can access the information. The browser makes a request to DNS to get the IP address of the web server which hosts the desired content. The user's PC will access an external DNS server, or, if available, DNS information in cache.

This multi-step method is used for two reasons. First, numerical IP addresses are not as easy to remember as URLs with alphabetic names. (Clark Decl. at ¶ 13.) Second, this system avoids having to change a URL every time the physical location of a web page is changed. (Clark Decl. at ¶ 14.) For example, a user seeking to access a Prodigy web page would type *www.prodigy.net* to reach Prodigy, whether Prodigy's servers are housed in New York or in Alaska.

An example of how the computer must access additional information is demonstrated by an extremely frustrating experience that Internet users commonly experience. If the DNS system is unavailable, the user cannot access the desired information. This is because the URL is not a complete address. Rather, it points to other information that must be accessed in order to pull up the requested Web page.

Both Sargent, the sole named inventor of the '662 patent, and Clarke, the BT Head of Division who monitored the overall system design of Viewdata, concurred that the complete address required by the '662 patent requires a physical address, including a tract and sector number of the desired block on the main store on the central computer. (Sargent Dep. at 198 ("the track and sector number is the complete address of where that page is"); Clarke Dep. at 11 ("[A complete address] would certainly include a sector number,

because if you do not have a sector number you do not have anything like a complete address.").)

A URL contains names—or virtual addresses. It then points to several other sources of information that must be obtained to determine a complete address:

1. The user's computer must first attempt to translate the URL server name into an IP address, by reference to other information in the form of either the external DNS service or locally-cached DNS information.[10]

2. When communication with a content server is achieved, the relative path contained in the URL must be translated using other information in the form of the configuration file of the content server to identify an actual path; and

3. The actual path must be referred to other information in the form of a lookup table on the operating system's file system to determine a physical address for the requested information.

BT responds to Prodigy's argument by arguing that the complete address is the path component of the URL, not the entire URL. (Wah Report ¶¶ 202, 205.) BT therefore argues that DNS resolution is irrelevant, because the path component of the URL only comes into play after the domain name resolution process has been established. BT notes that during DNS resolution of the Web server name, the path component is not modified. Hence, BT asserts that what Prodigy is doing is attempting to avoid infringement by arguing that the Internet has additional elements that the patented invention does not require.

However, BT's alleged "complete address"—the path name—is by definition incomplete on a network of networks like the Internet. BT's own expert concedes as much. (Wah Report ¶ 32; BTO at 25.) In the absence of the server information, the user's PC could not know which one of the millions of computers on the Internet is supposed to give it the desired information. This problem does not arise in the context of the Sargent patent, of course, since it requires a central computer. But in the context of the Internet, a path name cannot be a complete address.

BT argues that the phrase "without referring to other information," as construed by the Court, requires only that the "complete address" be a unique reference to a memory location rather than a virtual address. BT asserts that regardless of the type of address used, a computer will translate and reformat the address into various forms and formats before the computer accesses the memory location referenced by the address. Therefore, plaintiff's argument is that the construction provided by the Court—that a complete address is a "name or number"—necessarily requires some translation, since names must be translated by the computer into a digital or binary form before they can be processed by the computer. (*Markman Op.* at 115.) BT contends that the Sargent patent contemplates that the computer will perform routing tasks such as translating the complete address for a file name into its equivalent binary number representation which the computer uses to access the referenced memory location.

But BT's argument would render the term "complete address" meaningless. The testimony of its own expert, Dr. Wah, illustrates the point. Dr. Wah takes the position that, since virtual addressing is excluded from the scope of "complete address," every identifier is a complete address unless it is a virtual address:

10. This may require reference to many DNS servers.

Q. What if I typed an address and it was displayed on the screen and a runner looked at the screen, went through a phone book, and determined the physical address; would that be other information?

A. According to the judge's ruling, anything that is not virtual addressing does not—it is not information that would be relevant. Meaning—

Q. You are saying any other information, in your opinion, is possible, as long as it is not virtual addressing?

A. That is correct.

(Wah Dep. at 108.) Dr. Wah was then asked to assume that the Court's construction prohibiting "other information" prohibited any other information, not just "virtual addresses." When asked if URLs are complete addresses applying that construction, Dr. Wah admitted that they are not. (*Id.*)

Dr. Wah is right about this, and unfortunately for BT, the term "complete address" as used in the Sargent patent means that the address really is *complete*, in that it does not require reference to additional information in order to retrieve the requested information. BT's interpretation would eliminate the word "complete" from the patented claim language, something this Court cannot allow. Thus, as a matter of law, a URL or even a subset of a URL is not a "complete address" as defined by the Sargent patent.

2. Doctrine of Equivalents

a. Application of the Doctrine of Equivalents is Barred with Respect to the Complete Address element because the Applicant Made Unmistakable Assertions to Avoid Prior Art.

During the prosecution of the Sargent patent, the applicant replaced the

original claims with claims 19–22,[11] narrowing the literal scope of the claims. Because the applicant relied on narrowing amendments to overcome the prior art, equivalents are unavailable with respect to these claim limitations. *Warner–Jenkinson*, 520 U.S. at 33, 117 S.Ct. 1040. Thus, BT is barred from asserting that Prodigy's Internet Service meets the complete address element under the doctrine of equivalents.

In response to an obviousness rejection over the Cramer reference, the Applicant argued that the '662 patent does not rely on pointers to the complete address. (Applicant's Amendment dated August 29, 1983 at 7; Applicant's Amendment dated March 28, 1985 at 6; Applicant's Amendment dated Dec. 4, 1985 at 9; Applicant's Appeal Brief dated Jan. 24, 1986 at 9; Applicant's Appeal Brief dated Jan. 5, 1987 at 15.) As the Court noted in the *Markman* opinion, during the course of the patent prosecution, the applicant distinguished the NTZ article by stating that his simple addressing system allows the "abbreviated keyed-in data to directly read out the complete address of the next block to be fetched from the main store." (Dec. 4, 1985 Amend., File Wrapper Tab 16 at 9–10.)

In distinguishing the Sargent patent from Tsuda the applicant stated:

Indeed, the execution of a "Judge Order" (col. 6, line 40 et seq.) [as described in Tsuda] involves a fairly complex algorithm to determine what next should be displayed. By contrast, the applicant's novel arrangement permits one to merely directly read out from a "further" memory the next complete address—as addressed by abbreviated input keyed-data.

11. These claims became claims 1–4 of the issued patent.

(*Id.* at 7.)

These arguments were relied upon by the Board of Patent Appeals:

> We find no indication, however, that the "Request Order" [taught by Tsuda] includes the complete addresses of the next block of information which is to be retrieved and utilized for display purposes as claimed. At most it would appear to us from a review of the [prior art] that the data included in the request order [taught by Tsuda] would be used by the computer (1) for determining such an address.

(Appeals Decision dated May 9, 1983 at 4.)

The Applicant made these arguments in order to distinguish the complete address from the virtual address and branching programs used in prior art. Consequently, BT is precluded from asserting that a virtual address infringes under the doctrine of equivalents because here, too, it made narrowing amendments during prosecution that limited the scope of the term "complete address."

> b. Even if Prosecution History Estoppel did not Prevent BT from Claiming that Equivalents Infringed the Sargent Patent, Prodigy Would Still Be Entitled to Summary Judgment as a Matter of Law.

URLs function in substantially different ways from complete addresses. URLs identify a computer and page by name, instead of by address. Indeed, a URL is the antithesis of a complete address, because it cannot call up a Web page without accessing additional information. In other words, a URL is incomplete. Since an incomplete address is the antithesis of a complete address, there can be no infringement under the doctrine of equivalents.

## II. Contributory Infringement and Active Inducement

Because the Internet itself does not infringe the Sargent patent, Prodigy can not be liable for contributory infringement or active inducement for providing its users with access to the Internet. I therefore need not address BT's arguments concerning contributory infringement and active inducement in any detail.

## III. Prodigy's System Does Not Directly Infringe the '662 Patent

BT's argument that Prodigy's Web servers directly infringe the Sargent patent also fails, because Web pages stored on Prodigy's web servers do not contain "blocks of information" or "complete addresses" as claimed in the Sargent patent. Therefore, Prodigy's System does not infringe the '662 patent as a matter of law, and I need not address Prodigy's other non-infringement arguments.

## CONCLUSION

In contrast to what BT would have us believe, there are no disputed issues of material fact in this case. Instead, the two sides reach vastly different conclusions based on the same set of facts. I find that, as a matter of law, no jury could find that Prodigy infringes the Sargent patent, whether directly or contributorily, either as part of the Internet or on its Web server viewed separate and apart from the Internet. Prodigy's motion for summary judgment is therefore granted. The Clerk is directed to close the file.

This constitutes the decision and order of the Court.